278 P.2d 417

The BANK OF DOUGLAS, an Arizona corporation, Appellant,

v.

J. W. ROBINSON, E. I. Whiting, and Whiting Brothers Lumber Yards, Inc., a corporation, Appellees.

No. 5792.

Supreme Court of Arizona.

Dec. 31, 1954.

Rehearing Denied March 1, 1955.

232

Darnell, Robertson, Holesapple & Spaid, Tucson, Ryley, Carlock & Ralston, Phoenix, for appellant.

Udall & Udall, Tucson, for appellees.

LOCKWOOD, Superior Court Judge.

Appellees, J. W. Robinson, E. I. Whiting, and Whiting Brothers Lumber Yards, Inc., a corporation, hereafter referred to as plaintiffs, brought suit against The Bank of Douglas, an Arizona banking corporation, hereafter referred to as "the Bank", for cancellation of six promissory notes made payable to the Bank, and signed "Whiting Brothers, by J. W. Robinson", in the aggregate amount of $45,850. The defendant Bank resisted the action and filed a counterclaim against the plaintiffs in the amount of $38,050, for the alleged balance due on the same notes.

The case was tried to a jury, to which were submitted forms of general verdicts, and seven special interrogatories. On the former the jury returned a general verdict in favor of the plaintiffs on their complaint and against the Bank on its counterclaim,

and answered the interrogatories in each instance favorably to the plaintiffs. The court entered judgment for the plaintiffs, and from the judgment, and from the orders of the court denying defendant Bank's request for findings of fact and conclusions of law, motions for dismissal of plaintiffs' complaint, to set aside the verdict, to set aside the judgment, for judgment notwithstanding the verdict, from order denying motion for new trial, and for equitable relief, the Bank instituted this appeal.

The facts appear as follows:

One Edward Moore, a contractor, was engaged in numerous home-building enterprises in and about Tucson, Arizona. He had obtained financing from the Bank, through its Tucson branch. His indebtedness had reached such proportions that in the fall of 1950 certain bank officials had advised him that the Bank would not make any further advances until he had completed the houses already under construction. However, the Bank did in fact continue to advance him money until some time in July of 1951. Although his account fluctuated somewhat, it was over $96,000 by July 10 of that year.

Some time in the summer of 1950 Moore began purchasing quantities of building materials from plaintiff Whiting Brothers Lumber Yards, Inc., which conducted its business operations in Tucson, and of which Mr. E. I. Whiting was president and chairman of the board of directors. Moore became indebted to the plaintiff corporation in an amount in excess of $135,000 by mid-June of 1951.

While it appears that plaintiff E. I. Whiting took an active part in the operation of the Tucson lumber yard and the affairs of the plaintiff corporation, plaintiff Robinson was employed in Tucson as office manager and in charge of the business operations in the absence of Mr. Whiting, who resided in St. Johns, Arizona.

About the middle of June, 1951, plaintiff E. I. Whiting employed one A. B. Angle, a business consultant, to make a survey of Moore's construction business. Mr. Whiting, together with Mr. Angle, called at the Bank several times and discussed the indebtedness of Moore both to the Bank and to plaintiff corporation. On June 30, 1951, plaintiff corporation and Moore entered into a written agreement whereby Angle was employed as a "coordinator" to exercise some control over Moore's business for the purpose of allowing him to complete his construction program and pay off his indebtedness to the plaintiff corporation—in other words, to help "pull him out of the hole" and keep him from becoming insolvent until he could complete his construction operations as then contemplated.

On the same day the coordinator agreement was signed, plaintiff E. I. Whiting and Angle went to the office of the Bank and conferred with Mr. John L. Emery, a vice-president of the Bank. Mr. Whiting had earlier indicated he wished to "open an account" with the Bank for the purpose

of borrowing some money to use in connection with his business with Moore, and had furnished to the Bank three financial statements, one for himself, one concerning plaintiff corporation, and a third for another Whiting corporation. It appears that the Whitings are engaged in numerous business ventures of varying nature. Whiting told Mr. Emery he would have Robinson come in and complete the matter, if he needed a loan. The Bank shortly thereafter established an open line of credit in the amount of $50,000 for "the Whitings", and on July 3, 1951, Robinson signed a note to the Bank in the amount of $29,450, the signature being "Whiting Brothers, Inc., by J. W. Robinson". The Bank deposited said amount to a general account for Whiting Brothers. This transaction took place, although the usual signature cards and corporate resolutions had not yet been furnished as required by the Bank under its banking practice. The evidence is contradictory as to whether E. I. Whiting was present when this note was actually executed, though he admits that it was authorized.

Two signature cards and two forms of corporate resolution were subsequently furnished to the Bank. One signature card, dated July 10, 1951, bears signatures of E. I. Whiting and E. F. Whiting; the other, dated July 13, 1951, bears the signatures of E. I. Whiting, E. Farr Whiting, and J. W. Robinson. Each of the cards is headed "Whiting Brothers Lumber Yards, Inc."

and each refers to a resolution supporting the signatures. The card bearing Robinson's signature also bears the word "(Special)". One resolution, bearing date July 10, 1951, authorizes E. I. Whiting, E. Farr Whiting or Virgil B. Whiting to borrow money and execute notes to the Bank; the other, dated July 30, 1951, authorizes "Whiting Brothers Lumber Yards, Inc., Special Account: E. I. Whiting, E. Farr Whiting, Virgil B. Whiting, J. W. Robinson. Each authorized to sign singly", in borrowing of money and executing of notes to the Bank, and further authorizes said persons to "make assignments of contracts and notes to the Bank of Douglas, and to sign notes to the Bank of Douglas, and to sign notes supporting such contracts and assignments".

Two accounts were set up by the Bank, one designated the general account, and the other the "special" account. From time to time plaintiff Robinson executed 60-day notes to the Bank, signed in the same form as the $29,450 note hereinabove referred to. Each note was secured by an assignment of mortgage loan proceeds payable to "Whiting Brothers" from Western American Mortgage Company, which had financed buyers of Moore's houses through mortgages. These proceeds were those to which Moore would have been entitled originally from the mortgages just referred to, and which he had assigned to Whiting or Whiting Brothers to secure their materialman's liens on such houses.

The Bank credited the first $29,450 loan, together with a later loan in the amount of $6,300 dated July 27, 1951, to the general Whiting Brothers Account, and the other notes signed by plaintiff Robinson to the "special" account. Both of the above-mentioned notes were paid from proceeds of mortgages held by Western American Mortgage Company, originally assigned to Whiting Brothers, and by the latter to the Bank.

In addition to the notes sued on, two other notes, for $6,300 and $6,250, each dated August 24, 1951, were executed to the Bank in the name of Whiting Brothers Lumber Yards, Inc., by plaintiff E. I. Whiting, and secured by assignments of mortgage proceeds in the identical manner as the notes executed by plaintiff Robinson.

Bank deposit slips in the amounts of the notes as they were deposited to the Whiting Brothers account were issued and furnished to Whiting Brothers, and a bank statement showing the status of the "special" account with regard to deposits and withdrawals was furnished by the Bank and received by plaintiffs on or about August 1, 1951.

In the latter part of August, 1951, plaintiff E. I. Whiting went to the Bank's Tucson office and held a conversation with Mr. Wertz, another vice-president of that institution, who was conversant with the Moore affair. The evidence is conflicting with regard to the entire tenor of the conversation, but does show conclusively that Whiting in October of 1951 paid the two notes of August 24, executed by him.

One note, executed by Robinson in the same manner as all others here involved, dated July 12, 1951, in the amount of $8,800, shows on its face "Security: Assignment of proceeds on Miguel Cervantes house." It was reduced by endorsement to the Bank of two checks, dated August 20 and 22, 1951, made payable to "Whiting Brothers" by the Arizona Land Title and Trust Company, escrow holder of the mortgaged homes. The first check, in the amount of $7,696.14, was endorsed to the Bank by plaintiff E. I. Whiting, and the second, in the amount of $103.86, was endorsed to the Bank by plaintiff Robinson, and bears under his endorsement the words "Payment on Cervantes note." Both checks on their faces bear an escrow number and beneath it the word "(Cervantes)".

The record shows that all but $46 of the money from the "special" account was checked out by plaintiff Robinson to Moore's bank account, the $46 being transferred on August 27, 1951, to Whiting Brothers Lumber Yards, closing the "special" account.

Appellant Bank makes twelve assignments of error, based on four propositions of law. These assignments of error and the propositions of law supporting them are based primarily on the Bank's contention that the trial court should not have submitted to the jury the questions of consideration and of delivery of the notes.

■ With regard to the question of delivery, the court instructed the jury as follows:

"Now as to the alleged lack of delivery of the notes, which is one of the defenses the plaintiffs rely on in this case to seek to avoid payment of the notes; as to that alleged lack of delivery the Court instructs you that every contract or negotiable instrument is incomplete and revocable until the delivery of the instrument for the purpose of giving effect thereto",

and refused to give the following instructions requested by the Bank:

"You are instructed that the evidence in this case shows that the notes sued on were delivered to the defendant Bank."

"It is not a defense in a suit on promissory notes that they were made payable to a bank upon the representation of one of the bank's officers that the maker would never have to pay them and were delivered upon that condition."

The physical delivery of the notes in question to the Bank is admitted. Plaintiffs, however, claimed that Robinson was not authorized to execute notes for a special account, and was induced to do so by certain bank officers, Mr. Wertz or Mr. Emery, by their assertions that Whiting Brothers would never have to pay them, their only purpose being to establish a "control account" to conceal from bank examiners and directors or other officers of the Bank the true state of affairs—that is, that the proceeds of the notes were to be used in Moore's business. Plaintiff Robinson testified to such statements by Mr. Wertz, a vice-president of the Bank, and stated that he would not have signed and delivered the notes to the Bank except for such statements.

The decisions are practically uniform in holding that an oral promise by the payee of a promissory note that the maker will never be required to pay it violates the parol evidence rule, although evidence is competent which will show that the delivery was conditional in nature.

■ This court, in Fischer v. Hammons, 32 Ariz. 423, 259 P. 676, recognizes and affirms this principle. There we held that a promise made by the cashier of a bank that the maker would not be called upon to pay the note would not release the maker from an obligation to do so, but that notes executed by the maker upon the representation by the cashier that they would not be complete or delivered until the signatures of certain other persons were secured, were delivered conditionally. We can find no elements of conditional delivery of the notes here in question. They were given to secure credit from the Bank—the credit of Whiting Brothers—at the time of deposit to Whiting Brothers of the amount of the

loan of each note. Hence evidence that the officers of the Bank promised plaintiff Robinson that the Whiting Brothers would never have to repay the notes was inadmissible, and the instruction given by the court based upon that defense was error, and the instruction requested by the Bank on the question of delivery of the notes should have been given. It was error not to give it.

The trial court further instructed the jury as follows:

"The plaintiffs have charged in this case, Ladies and Gentlemen, that on or about the 13th day of July, 1951, the defendant represented to plaintiff's employee, J. W. Robinson, that the defendant desired to extend further credit to Edward Moore but could not do so because of banking regulations, or because certain officers or committees of defendant would not approve of further credit to Moore that it desired the plaintiff to execute notes to accommodate the bank in evading these regulations and making further loans to Moore, that the notes would not be valid or impose liability on the plaintiffs. And the plaintiffs allege that in reliance upon these representations and solely because of them J. W. Robinson executed the notes in question.

"If you believe from a preponderance of the evidence that these alleged facts are true, then it is your duty to return a verdict for the plaintiffs, as they cannot be liable in such an instance."

The above instruction was based upon plaintiffs' evidence, through the testimony of Robinson, that Mr. Wertz, an officer of the Bank, induced Robinson to sign the notes in order to deceive the bank examiner or other officers of the Bank, and that Robinson executed the notes with that understanding. This evidence being inadmissible the instruction was clearly erroneous.

To permit such a defense is contrary to sound public policy. German American State Bank v. Watson, 99 Kan. 686, 163 P. 637; Rogers v. First State Bank of Augilar, 79 Colo. 84, 243 P. 637; Cedar State Bank v. Olson, 116 Kan. 320, 226 P. 995. To hold otherwise would permit fictitious paper to be held by banks, with no protection to creditors, stockholders, or perhaps depositors, in their reliance upon the bank's assets. Such a secret agreement on the part of a bank officer is ultra vires, and the bank cannot be held party to it.

Assignment of Error No. 5 is refusal of the trial court to give the following instruction requested by the Bank:

"You are instructed that the evidence in this case shows the notes sued on were made and delivered for a valid and sufficient consideration."

Assignment No. 10 is directed to the giving by the trial court of the following instruction:

"However, if money is voluntarily advanced by a bank for the benefit of the third party, and the bank requests and induces another person to sign a note to cover said money, with the understanding and agreement that the signing of said note is merely a convenience or memorandum for the bank, that the person signing the note will not be called upon to pay it, then you are instructed that there is no consideration for said note and that the person or persons signing it cannot be required to pay the same."

As we have already stated, a mere promise that the maker will not be required to pay a note, if it is supported by sufficient consideration, is no defense, and violates the parol evidence rule. Nowhere in the record can we find evidence that the notes in question were given as "a mere convenience or memorandum", in the sense that they were not what they purported to be on their face; that is, promissory notes. In Hammons v. O'Brien, 32 Ariz. 436, 259 P. 881, 883, the defendant had signed several instruments *in blank,* which were filled out by the cashier as to amount, interest, etc., and money was placed to the account of either the defendant or to a mining company which was being superintended by the defendant. One Batre, the president of the bank, who was also president and principal stockholder of the mining company, told the defendant he had plenty of money in the bank, and to make out notes and present them to the cashier for meeting the payroll of the mine. The defendant claimed lack of consideration when sued for recovery on the purported notes.

This court reaffirmed that

"A detriment suffered by the payee of a note at the instance of the maker thereof * * * will be sufficient consideration to support the note, even though the maker thereof received no personal benefit by reason of the execution and delivery thereof."

but further held that under the facts above stated, there was no actual loan to the defendant, since the notes were filled out by the cashier and paid out at the request of Batre, for his own use and benefit, and were actually not notes but memoranda or receipts for money loaned by the bank on the credit of Batre. In the case at bar, the fact that the money advanced by the Bank on the notes was eventually used chiefly for Moore's payroll, does not in any way indicate that the notes were merely "memoranda" for the convenience of the Bank for money loaned on the credit of its officers. Whiting Brothers were not employed by the Bank, and had themselves employed a "coordinator" to keep Moore in business. The proceeds from the notes,

used to supply Moore's payroll, were certainly a benefit to the promisor, and the Bank's parting with some $45,850, over which it could thereafter exercise no control, was a detriment to the promisee, and this is sufficient to import a valid consideration.

The elements necessary to constitute a consideration for the notes being in evidence, there was no reason for submitting the question of consideration to the jury. The trial court erred, therefore, in giving the instruction complained of in Assignment of Error No. 10, and in failing to give the instruction requested by Appellant Bank, the basis of Assignment of Error No. 5.

There remains, then, only the question of plaintiff Robinson's authority to execute the notes. The court instructed the jury as follows:

"It is, of course, the law, Ladies and Gentlemen, that a corporation or an individual can become bound on contracts signed on their behalf by an agent. If there is to be liability upon the principal in such cases, however, it is necessary that the person signing the contract not only be an agent of the person or corporation, but that he have actual, implied or apparent authority to sign the particular contract in question. Authority to act as agent for a principal in a particular matter is not created unless the principal directly or by implication or apparently requests or has requested the agent to act as his agent, and has authorized the agent to act in his stead.",

and refused to give the Bank's requested instruction:

"Plaintiff Robinson was authorized by plaintiff corporation to sign the notes sued on."

It is our opinion that the only competent evidence with regard to Robinson's authority to execute the notes in question was uncontradicted. Plaintiff corporation by resolution executed a corporate authorization for plaintiff Robinson to sign notes and make assignments of contracts supporting such notes. The trial court, in view of the evidence, should not have submitted the question of Robinson's authority to the jury.

In view of the foregoing the judgment of the trial court is reversed and the cause remanded, with instructions to dismiss plaintiff's complaint and to enter judgment for defendant on its counterclaim.

PHELPS, C. J., and STANFORD, LA PRADE, and WINDES, JJ., concurring.

Note: Justice LEVI S. UDALL, having disqualified himself, the Honorable LORNA E. LOCKWOOD, Judge of the Superior Court of Maricopa County, participated in his stead in the determination of this appeal.